# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

DAWN A. ALFORD,

                          Plaintiff,

-vs-                                                    Case No.  6:05-cv-487-Orl-JGG

JO ANNE B. BARNHART
COMMISSIONER OF SOCIAL
SECURITY,

                          Defendant.
_____

## MEMORANDUM OF DECISION

Plaintiff Dawn Alford ["Alford"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

Plaintiff Dawn A. Alford filed a claim for disability insurance benefits on January 8, 2003 (with a protective filing date of December 26, 2002), claiming disability due to a combination of impairments (including congestive heart failure, chronic obstructive pulmonary disease ["COPD"], hypertension, hyperlipidemia, swelling in the legs, weight gain, memory loss, impaired concentration, anxiety disorder, and depression) as of August 18, 1998. R. 59, 66-68, 152.[1] Alford's insured status

---

[1]Alford previously filed an application for disability insurance benefits on October 16, 2001, with a protective filing date of October 15, 2001.  R. 59, 63.  Her claim was denied initially on November 16, 2001, and upon reconsideration on February 21, 2002.  R. 27-29.  Alford filed her protective filing worksheet related to this action on December 26, 2002, and did not further pursue her earlier application.. R. 65.

expired on June 30, 2001.  R. 69, 70-76.  Her claim was denied initially on January 22, 2003, and upon

reconsideration on February 13, 2003.  R. 30-32.

On May 18, 2004, the Honorable Francis H. Ayer, Administrative Law Judge ["ALJ"], held

a hearing on Alford's claim in Tampa, Florida.[2]  Non-attorney Arlene Baird represented Alford at the

hearing.  R. 383.  The ALJ heard testimony from Alford, Charles Alford (Alford's husband), and

Jeffrey Carlisle, an impartial vocational expert ["VE"].  *Id.*

On September 22, 2004, the ALJ issued a decision that Alford was not disabled and not

entitled to benefits.  R. 20.  The ALJ found that her current application was "an implied request" to

reopen her previous application for benefits, and further found that the evidence submitted did not

warrant reopening the application.  R. 12.  Following a review of the medical and other record

evidence, the ALJ found that Alford retained the residual functional capacity ["RFC"] to perform the

physical exertional requirements of sedentary work, provided Alford was allowed to alternate between

sitting and standing, and that she did not elevate her leg any higher than chair level (or no higher than

parallel to the floor).  R. 20, Finding 6.  After hearing testimony by the VE, the ALJ found that Alford

could perform her past relevant work as an office manager as the work is customarily performed.  R.

19-20, Finding 7.  As Alford could perform her past relevant work, the ALJ concluded that Alford was

not disabled.  R. 20, Finding 9.

After consideration of an additional reports, R. 375-76, the Appeals Council denied review on

February 11, 2005.  R. 6.  On March 31, 2005, Alford timely appealed the Appeals Council's decision

to the United States District Court.  Docket No. 1 at 1, ¶¶ 2-3 (complaint).  On August 8, 2005, Alford

---

[2]The hearing transcript incorrectly states that Alford's hearing was May 18, 2003.  *See* R. 383, 418. The ALJ
held the hearing on May 18, 2004.  *See* R. 12 (notice of hearing), R. 21 (the ALJ's decision).

filed in this Court a memorandum of law in support of her appeal.  Docket No. 16.  On October 5, 2005, the Commissioner filed a memorandum in support of her decision that Alford was not disabled. Docket No. 17.  The appeal is ripe for determination.[3]

## II.   **THE PARTIES' POSITIONS**

Alford assigns two errors to the Commissioner.  First, Alford claims that the Commissioner erred in by failing to consider all of Alford's impairments and symptoms.  Docket No. 16 at 15. Specifically, Alford contends that the Commissioner failed to consider Alford's severe vision problems, bilateral hand weakness, and obesity.  *Id.* at 15-18.  Second, Alford claims that substantial evidence does not support the ALJ's determination of Alford's RFC because the record does not contain a physician's evaluation of Alford's physical RFC.  *Id.* at 19-20

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that substantial evidence in the record supports the ALJ's RFC finding, as well as the ALJ's determination that *all* of Alford's impairments do not significantly interfere with Alford's ability to perform her past relevant work as an office manager.  Docket No. 17 at 7-8.  Specifically, the Commissioner counters that Alford did not have significant vision problems, bilateral hand weakness, and obesity.  *Id.* at 9-10.  Second, the Commissioner argues that a physician's evaluation of Alford's physical RFC was not necessary, as the ALJ has the primary responsibility for assessing a claimant's RFC.  *Id.* at 10-11.

---

[3]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

### III.   **THE STANDARD OF REVIEW**

#### A.   **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

#### B.   **REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  The district court will reverse a

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for

district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material —  relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir.

-6-

1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[4] *Id.*

**D.    STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE**

Approximately one month before the ALJ's hearing and five months before the ALJ's decision, Alford sent to the ALJ a letter dated April 19, 2004, enclosing forms listing her medications and work history. R. 374-77. The ALJ did not consider those records. The Appeals Council, however, received and considered that evidence, and made it part of the record.[5] R. 5, 6, 9.

If a claimant submits evidence that does not relate to the relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file

---

[4]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Commissioner*, __ F. 3d __, 2006 WL 1843633 n.11 (11th Cir. July 6, 2006).

[5]After the ALJ's decision and before the Appeals Council decision to deny review, Alford also submitted arguments by representative Arlene Baird dated October 15, 2004 but no new evidence other than the medication and work history forms dated April 19, 2004. R. 9, 379-82.

a new application." 20 C.F.R. § 404.976(b)(1)(2005).  The Appeals Council did not return the additional evidence to the claimant.  Rather, the Appeals Council properly received that evidence, made it part of the record, and considered that evidence in denying review.  R. 5, 6, 9.  The district court also must consider the evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g)).  The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence.  *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues.  *Sims*, 120 S.Ct. at 2086.  When the Appeals

Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review.  20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086; *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review. *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council. *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision. *Sims*, 120 S.Ct. at 2086; *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence. *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).  Nevertheless, there is an important difference between *Falge* and this case — a difference stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the *ALJ's decision* to deny benefits.  150 F.3d at 1324.  In this case, however, the claimant does expressly appeal and seek a reversal of the Commissioner's final decision.  Docket No. 1 at 2, ¶¶ 11, 13.  The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review. *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066;

*accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005).

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies. When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error. *Sims*, 120 S.Ct. at 2086; *Keeton*, 21 F.3d at 1066. Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error. *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record). The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies. The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's

-10-

findings are supported by substantial evidence.  The Appeals Council's determination is subject to judicial review.  The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review."  *See Sims*, 120 S.Ct. at 2086;  *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g));  *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d

at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's

obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931,

934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special

duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all

the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts

and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.     THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520,

416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R.

§ 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments

which significantly limit his or her physical or mental ability to do basic work activities, then she does

not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's

impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she

is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her

from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's

impairments (considering his or her residual functional capacity, age, education, and past work)

prevent him or her from doing other work that exists in the national economy, then claimant is

disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe,

the ALJ must consider the combined effect of all of the claimant's impairments, and must consider

any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands

of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments,

impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*,

955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

-16-

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.   PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and

laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

## F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination

is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

## H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional

-19-

areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

-20-

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1. Some individuals may actually have worked during the period of time pertinent

-21-

to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional

restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.   **APPLICATION AND ANALYSIS**

### A.   **THE FACTS**

Alford was born on February 12, 1943, and was sixty years-old on the date the ALJ issued the decision that Alford was not disabled.  R. 383.  Alford has a high school education, R. 158, and has past relevant work experience as a cashier, hostess, airline security representative, transcribing machine operator, and an office manager.  R. 187.  Alford has not engaged in substantial gainful activity since August 18, 1998, her alleged onset date.  R. 13, 19, 386-87.  Alford was insured for disability benefits through June 30, 2001.

Alford claims disability as of August 18, 1998 due to a variety of impairments.  Alford submitted notes of treating physician, Dr. Richard E. Blackburn, from 1993.[6]  R. 188-90.  On January 6, 1993, Alford sought treatment with Dr. Blackburn.  R. 190.  Alford complained of having "unusual spells" (usually precipitated by flashing lights) during which she would tremble, perspire, become pale, experience headaches and nausea, and feel weak.  *Id.*  She also complained of having blurry

---

[6]The doctor's notes also contain a handwritten note by Alford stating that "[t]his is documentation of depression, agoraphobia and [panic] attacks."

vision during the episodes, but stated that she remained awake and aware of her surroundings during these episodes. *Id.* Alford reported having these attacks since before she was twenty years-old, but stated that the symptoms were worse in the previous two years. *Id.* She also stated that her more severe attacks involved feeling panicked and a "sense of impending doom, as if she might die." *Id.* Alford stated that the frequency of her attacks varied – anywhere from twice a week to zero times in a given month – and that stress seemed to increase the frequency of her episodes. *Id.* Alford complained of losing concentration while talking. She also expressed fear of crowds and flying in airplanes. Alford further reported a history of hypoglycemia. *Id.*

Dr. Blackburn noted that Alford had a past medical history for coronary catheterization (in January 1991), coronary artery disease, angioplasty, and hypertension. *Id.* Alford reported taking Cardizem, and stated that she smoked a pack of cigarettes per day for thirty years. R. 191. Alford also told Dr. Blackburn that she was working part-time as a medical transcriptionist. Dr. Blackburn's physical examination was mostly normal. *See id.* He noted that she was "very mildly anxious." *Id.* Dr. Blackburn's impression was panic attacks with agoraphobia. R. 191. He stated that although some of her self-described symptoms suggested photosensitive epilepsy or complex partial seizures, Alford's medical history and description of symptoms suggested panic attacks. R. 191-92. Dr. Blackburn recommended an electroecephalogram (EEG) to rule out epilepsy or seizures, and prescribed Pamelor, an antidepressant, for panic attacks. R. 192.

An EEG report dated January 7, 1993 revealed normal results. R. 189. Alford returned to Dr. Blackburn on March 3, 1993. R. 188. Alford reported "doing much better" since her previous visit. *Id.* She also stated that she was no longer having headaches or panic attacks, and overall, felt "a lot

calmer." *Id.* Alford further reported that her husband noticed the positive changes. Dr. Blackburn examined Alford, and noted that her physical examination was normal. His impression was that Alford's panic attacks with agoraphobia and tension headaches were "both much improved on Pamelor therapy." *Id.*

On April 6, 1999,[7] Alford sought treatment as a new patient with Dr. Joseph S. Thomas. R. 285-86. Alford reported having high blood pressure for the past several years. R. 285. She also told Dr. Thomas that recently she had high blood pressure despite taking Cardizem (used to treat high blood pressure and control chest pain). Dr. Thomas noted that Alford's past medical history included chronic essential hypertension, panic attacks, agoraphobia and depression. *Id.* Alford reported "otherwise [being] in her usual state of good health." *Id.* She further reported smoking half a pack of cigarettes per day since age eighteen. *Id.* Her physical examination was otherwise normal. *Id.* Dr. Thomas' impression was 1.) tachycardia, 2.) hypertension, 3.) obesity, .and 4.) a history of atherosclerotic cardiovascular disease with coronary artery disease, status post angioplasty, remote. R. 286. Dr. Thomas told Alford to stop using Cardizem, and ordered a complete blood count and hormone, lipids, and electrolyte tests. *Id.*

Alford's electrocardiogram (EKG) results, dated April 11, 1999, showed sinusitis tachycardia and non-specific ST abnormality. R. 286-87. Alford also underwent an echocardiogram (an ultrasound of the heart) on April 11, 1999. R. 283-84. The ultrasound results show mild to moderate enlargement of the left side of Alford's heart, and moderately severe tricuspid regurgitation suggestive of pulmonary artery hypertension. *Id.*

---

[7]Alford did not submit any records for the time period between 1993 and 1999.

On April 11, 1999, Alford went to the South Georgia Medical Center, and complained of shortness of breath, wheezing, and, coughing. R. 193, 209. Alford also reported experiencing pain in her right side. R. 205. From April 11 to April 15, 1999, Alford underwent several evaluations and consultations and a cardiac catheterization procedure on April 13, 1999.

At the Center, Dr. Thomas performed a physical examination and prepared a Cardiology Consultation Report. R. 204-10. The doctor noted Alford's history of coronary artery disease and her x-ray results showing evidence of mild congestive heart failure R. 205. Dr. Thomas' impression was 1.) coronary artery disease, 2.) COPD, 3.) hypertension, 4.) shortness of breath on exertion, 5.) congestive heart failure, and 6.) positive troponin (which Dr. Thomas considered to be of uncertain significance, but possibly consistent with pre-infarction angina). R. 204. Dr. Thomas recommended that Alford undergo cardiac catheterization as the best way to evaluate her heart and coronary arteries. *Id.*

Dr. Milledge Newton gave a Pulmonary Consultation on April 12, 1999. R. 200-03. Dr. Newton's assessment was: 1.) probable significant underlying chronic obstructive pulmonary disease (with current exacerbation due to acute bronchitis, and possibly pneumonia); 2.) probable congestive heart failure (as shown by a chest x-ray); 3.) possible acute myocardial infarction; 4.) underlying coronary artery disease (status post 1991 angioplasty); 5.) progressive dyspnea (shortness of breath); and 6.) hypertension due to ongoing tobacco use. R. 202-03. Dr. Newton recommended nebulizers, intravenous steroids, and inhalers, for Alford's pulmonary problems. R. 203. Dr. Newton further ordered pulmonary function tests, and agreed with the other doctors' cardiac reports and recommendation for catheterization. *Id.* The Pulmonary Function Studies revealed moderate

obstructive ventilatory defects, and some positive response to brochodilators.  R. 195.

Dr. Glenn H. Evans performed Cardiac Catheterization on April 13, 1999.  R. 196-99.  Dr. Evans found restenosis "of critical severity" in Alford's right coronary artery; possible critical ostial lesion in the left main coronary artery; an abnormal left ventricle with evidence of a prior inferior infarction; and mildly elevated left ventricular end-diastolic pressure (suggesting left ventricular noncompliance). R. 198.  Dr. Evans recommended transferring Alford to a tertiary center for further evaluation of her left main coronary artery, and possible coronary artery bypass surgery or an angioplasty with stent placement.  R. 198-99.

The South Georgia Medical Center discharged Alford on April 15, 1999, and transferred her to St. Vincent's Medical Center in Jacksonville, Florida for further procedures.  R. 193-94.  The discharge summary reported diagnoses of: 1.) non-Q-wave myocardial infarction, 2.) single-vessel critical coronary disease with unstable angina, 3.) COPD with exacerbation, 4.) atherosclerotic cardiovascular disease with coronary artery disease (status post angioplasty in 1991), 5.) chronic essential hypertension, and 6.) congestive heart failure.  *Id.*

Alford entered St. Vincent's Medical Center on April 15, 1999, and was later discharged on April 26, 1999.  R. 216-218.  Alford underwent another cardiac catheterization, and a coronary ultrasound of the left main coronary.  The coronary ultrasound revealed greater that fifty percent stenosis at the ostium of Alford's left main coronary artery.  R. 217.  Alford underwent a four vessel coronary artery bypass graft surgery on April 16, 1999.  *Id.*

Dr. Alan Schimmel, in the discharge summary, indicates that Alford developed some incoordination, difficulty with balance, and modest confusion after the surgery due to a mild stroke

-27-

(perioperative cerebrovascular accident). *Id.* Dr. Schimmel stated that otherwise postoperatively, "the patient did well." *Id.* The doctors prescribed beta blockers and iron supplements, and Alford received physical and occupational therapy for her stroke. *Id.*

While recuperating in Tennessee, Alford sought treatment with Dr. David Vines (of the East Tennessee Medical Group) on May 26, 1999. R. 251-54. Alford expressed concern that her left leg was not healing as well as it should after the surgery, and noted experience open drainage in the leg. R. 251. Alford also complained of feeling depressed because she had just moved to a new place, Tennessee, and she felt "down in the dumps." *Id.* Dr. Vines noted Alford's history of hypertension, and stated that it was "fairly well controlled." *Id.* Upon examination Dr. Vines observed that Alford's left leg had scarring from the bypass surgery with one open area (about an inch and a half long). *Id.* He also noted that the open area had some "yellowish drainage and erythema [but that] otherwise the wound looks fairly good." *Id.*. Dr. Vines assessed coronary artery disease, hypertension, and depression and anxiety. R. 252. Dr. Vines prescribed Celexa, an antidepressant. *Id.* The doctor also noted that Alford had small strokes at St. Vincent's Medical Center after the bypass surgery, but stated that Alford "has done well from that and continues aspirin." *Id.*

On June 16, 1999, Alford sought treatment with Dr. Susan Jane Souther, a cardiologist, upon referral from Dr. Vines. R. 246-49. Alford reported that since her surgery, she had lower extremity swelling and difficulty with her vision, but otherwise, no other problems. R. 246. Alford also stated that she had no residual extremity weakness. *Id.* Alford specifically complained that since her surgery, her vision problems included seeing words "run together"; having difficulty distinguishing between Ns and Rs; and experiencing partial loss of peripheral vision. R. 247. Upon examination,

-28-

Dr. Souther described Alford as moderately obese.  She also observed that Alford's left lower extremity was large and tight with swelling, but did not observe any infection.  R. 247-48.  Dr. Souther stated that Alford appeared to be doing well postoperatively, and recommended that Alford clean her leg wounds aggressively three times a day.  R. 248.  Dr. Souther prescribed Lasix and potassium for the leg wound, and referred Alford to an ophthalmologist for her vision problems.  R. 248-49.

The record contains one handwritten note from ophthalmologist Bryce Joslin.  R. 243.  The note, dated June 22, 1999, (and written on a prescription notepad) states that Alford had some cholesterol emboli behind her right eye.  R. 243.  Alford later reported (to Dr. Souther) that Dr. Joslin recommended Alford check with Dr. Souther about medication to lower her cholesterol.  R. 245.  Alford returned to Dr. Souther on June 23, 1999, who prescribed Micardis and Zocor for cholesterol.  *Id.*  Alford returned to Dr. Souther on July 9, 1999 for a blood pressure check.  R. 244.  Dr. Souther noted that Alford's leg appeared improved, and that the swelling decreased by fifty percent.  *Id.*  Dr. Souther recommended that Alford continue her medication.  *Id.*

After returning to Georgia, an unnamed physician saw Alford on September 28, 1999 upon referral from Dr. Thomas.  R. 256.  The doctor noted that Alford "has had some evidence of either embolic or ischemic phenomena resulting in some bilateral hand weakness and some vision changes. This has been fully evaluated by a neurologist.  She presents today for a routine follow up."  *Id.*  The doctor described Alford as moderately obese, and also noted that Alford had some complaints of bilateral lower extremity claudication.  *Id.*

On March 8, 2000, Alford visited Dr. Thomas, and reported experiencing intermittent claudication.  R. 270.  Alford also complained of occasional constipation.  *Id.*  Dr. Thomas ordered

-29-

laboratory tests for TSH hormone, lipids, electrolytes, and stool guiac.  *Id.*  He also recommended Pletal (to reduce the symptoms of intermittent claudication), and that Alford decrease her dosage of Lopressor, but continue taking Ziac. *Id.*

On April 11, 2000, Alford returned to Dr. Thomas.  R. 269.  She continued to complain of intermittent leg cramps and claudication symptoms.  *Id.*  Alford also reported experiencing generalized weakness, fatigue, and having no energy.  *Id.*  She also stated that her blood pressure is elevated.  *Id.* Dr. Thomas recommended that Alford increase her dosage of Pletal and Ziac, and stop taking Lopressor.  *Id.*  Dr. Thomas saw Alford again on May 23, 2000.  R. 268.  Alford complained of having dyspeptic symptoms.  Also, Dr. Thomas recorded weight as 205 pounds, an increase since her previous visits.  *Id.*  Dr. Thomas prescribed Prevacid for dyspepsia, and recommended that Alford lose weight.

Alford returned to Dr. Thomas on August 30, 2000 with no acute complaints.  R. 267.  She continued to complain, however, of generalized weakness, fatigue, and having no energy.  *Id.*  Dr. Thomas again noted that Alford had gained weight.  *Id.*  Dr. Thomas' physical examination was mainly normal.  *Id.*  Dr. Thomas recommended that Alford stop taking Cardizem, and prescribed Norvasc (used to treat high blood pressure and angina).  He recommended a follow up appointment to recheck her blood pressure.  *Id.*

Alford saw Dr. Thomas on October 31, 2000, and reported that the Pletal medication seemed to be helping her lower extremity, leg, and muscle cramps.  R. 263.  She also reported being able to walk further than she previously could.  *Id.*  Alford reported no other physical problems.  *Id.*  Dr. Thomas recommended that Alford lose weight, and continue her current medication and diet.  *Id.*  On

-30-

April 18, 2001, Dr. Thomas saw Alford, who had no acute complaints. R. 258. Dr. Thomas' physical examination, including a HEENT (head, eyes, ears, nose, throat) examination was unremarkable. *Id.* The doctor continued to recommend that Alford lose weight. *Id.*

Alford's insured status expired on June 30, 2001. R. 69, 70-76. After Alford moved to Florida, she visited Dr. W. Brent Young on August 22, 2001 for an evaluation. R. 341. Dr. Young's physical examination revealed evidence of pretribial and ankle edema. *Id.* The doctor noted that Alford's symptoms were consistent with vasculogenic claudication, and that Alford had minimal plaquing in her carotid arteries. *Id.* Dr. Young noted that Alford was smoking one pack of cigarettes per day. *Id.* Dr. Young told Alford to stop smoking, and prescribed Wellbutrin for smoking cessation. He also recommended that Alford undergo a carotid duplex lower extremity arterial sonography, and discontinue using Pamelor. *Id.*

An arterial ultrasound dated August 27, 2001 revealed significant high grade stenosis of both iliac or common femoral arteries, which was worse on Alford's right side. R. 338-40. The ultrasound also showed significant small vessel disease, and revealed that both of Alford's ankle brachial indices were "quite depressed." R. 338.

On September 10, 2001, Alford returned to Dr. Young. R. 334-35. Dr. Young noted that Alford could not take Wellbutrin. R. 334. Alford reported still smoking one pack of cigarettes per day. *Id.* He noted that Alford had problems with hyperlipidemia, high cholesterol with slightly elevated triglyceride level. Dr. Young also assessed morbid obesity, long-standing history of tobacco use, and vasculogenic claudication, secondary to severe peripheral arteriosclerotic vascular disease. *Id.* He recommended that Alford continue her current medications, and referred Alford to a vascular

surgeon.  R. 335.

On September 17, 2001, Dr. Ronald Yarrington saw Alford (upon referral from Dr. Young) to evaluate Alford's carotid arteries and her leg-related complaints.  R. 289-91.  Alford reported smoking approximately two packs of cigarettes per day.  R. 289.  She wore stockings for leg swelling in the left lower extremity, the place of the donor incisions from her coronary artery bypass surgery two years prior.  R. 289.  Alford reported that she had gained a lot of weight after attempting to stop smoking, but that she lost twenty pounds since she began smoking again.  She complained of long-distance claudication – the distance between the parking lot and the doctor's office could cause distress.  R. 289.  Alford also complained of a tendency to bleed; hearing problems; occasional tinnitus; shortness of breath on walking several blocks and on climbing one flight of stairs; poorly controlled hypertension; leg cramps at night, stress incontinence, backaches; paresthesias and loss of sensation in the hands; feeling tired for no reason; dryness of skin; being easily bruised; intolerance to warm environments; and recurrent sores on the forearms.  R. 290.

Dr. Yarrington's impression was early carotid disease and peripheral vascular disease compounded by venous insufficiency secondary to old leg vein harvesting on the left side.  R. 290. The doctor recommended that Alford quit smoking, and wear a custom-made stocking on her left leg, but not on the right leg.  Dr. Yarrington also told Alford that she should walk as much as possible and use a stationary bike at home to increase her exercise tolerance and encourage collateralization (blood vessel growth).  R. 291.

On October 9, 2001, Alford sought treatment with Dr. Andre Brooks for symptoms of pressure in the sternum.  R. 371.  Alford reported a history of congestive heart failure, and told Dr. Brooks that

she also had temporary blindness in her eye. *Id.* She also reported shortness of breath with exertion, and a history of possible cholesterol embolization (according to Dr. Joslin's diagnosis from June 1999). Alford further complained of claudication and some pain in the legs when walking. *Id.* Dr. Brooks assessed ischemic heart disease with transient ischemic attacks in the past. *Id.* Dr. Brooks recommended that Alford follow up with Dr. Young and continue Dr. Young's medication plan. *Id.*

On November 16, 2001, a state agency psychologist reviewed Alford's disability benefits application file. R. 293. The psychologist noted that Alford alleged having memory loss, depression, and panic attacks, but the file contained insufficient evidence to make a determination about her mental RFC as of June 30, 2001, the date Alford's insured status expired. R. 305. The psychologist observed that other than documents from 1993 that mentioned Alford's panic attacks, the file contained no other relevant treatment notes. *Id.*

On January 4, 2002, Alford visited Dr. Young. R. 328-29: During this visit, Alford's chief complaint was increased frequency of urination, urinary urgency, and dysuria for the past two weeks. *Id.* Alford also reported smoking two packs of cigarettes a day. R. 328. Dr. Young described Alford as morbidly obese. *Id.* Dr. Young assessed: "refractory behavioral pattern referencing tobacco product use"; very mild hypertriglyceridemia; a history of peripheral arteriosclerotic vascular disease; and chronic recurrent urinary tract infection. R. 329. The doctor advised Alford to stop smoking, but responded that she was not interested in quitting. *Id.* Dr. Young also recommended that Alford restrict her caloric intake and exercise for weight loss. *Id.*

Alford returned to Dr. Young on January 24, 2002. R. 325-26. Dr. Young's assessed refractory behavioral pattern regarding her smoking, morbid exogenous obesity, hypertension,

-33-

dyslipidemia, peripheral arteriosclerotic vascular disease, depression, and gastroesophageal reflux. R. 325.

On February 15, 2002, another state agency psychologist also stated that he had insufficient evidence to opine as to Alford's mental RFC as of the date she was last insured. R. 308, 320. This second psychologist also noted that Alford complained of short-term memory loss, but that aside from the 1993 records on Alford's panic attacks, there were "[n]o other psych notes on file." R. 320.

On April 23, 2002, Alford saw Dr. Young. R. 322-23. Dr. Young noted Alford's history of tobacco use, and that Alford had gained another four pounds since her previous clinic visit of January 24, 2002. He assessed morbid exogenous obesity, and poor cholesterol control demonstrated by Alford's laboratory results from February 2002. R. 322. Her physical examination was otherwise normal. Dr. Young observed that her extremities were mainly normal; her peripheral pulses were full and symmetric, and she had no clubbing, cyanosis, or swelling. *Id.* Dr. Young recommended that Alford continue taking her medications, restrict her diet and exercise for weight loss, stop smoking, dietary restriction, and have a lipid profile performed once a month. R. 323.

On August 14, 2002, Dr. Nathan C. Debavose conducted a Carotid Artery Duplex Study due to Alford's problems with atherosclerosis in her carotid arteries, hypertension, and numbness over the arms. R. 372. The study showed moderate stenosis of the internal carotid arteries (ICA) on both sides, and plaquing on both carotid bulbs. *Id.*

Alford filed a claim for disability insurance benefits on January 8, 2003, claiming disability due to chronic hypertension, coronary artery disease, congestive heart failure, COPD, hyperlipidemia, swelling of the left leg ankle and foot, claudication in both legs, short term memory loss, depression

and panic attacks; diminished coordination, numbness of hands and fingers, vision difficulties and shortness of breath . R. 81, 88.

Dr. Robert P. Dalton performed a Cerebrovascular Evaluation with Duplex Doppler on April 4, 2004. R. 342. The study showed moderate bilateral carotid artery disease; stenoses in the internal carotid arteries; antegrade flow in the right and left vertebral artery; and decreased blood pressure in left arm compared to right, suggesting possible proximal disease in the subclavian. *Id.* Dr. Christopher Brouillete[8] prescribed a portable oxygen system for chronic airway obstruction on April 6, 2004. R. 349. On April 8, 2004, Dr. Brouillete saw Alford, and assessed uncontrolled hypertension, hypertriglyceridemia, coronary artery disease, end stage COPD, and hyperglycemia. R. 354. An echocardiogram performed on April 8, 2004, showed mild concentric left ventricular hypertrophy and left atrial enlargement (consistent with hypertensive heart disease) and moderate pulmonary hypertension. R. 343.

On May 18, 2004, the ALJ held a hearing on Alford's claim. R. 383-418. The ALJ heard testimony from Charles Alford, Alford's husband, and Jeffrey Carlisle (the VE). *Id.* During the hearing, Alford had a nasal cannula inserted in her nose for her portable oxygen container, and sat in a wheelchair. R. 385. She subsequently testified that she rented the wheelchair. R. 392. Alford began her testimony by describing why should cannot work. She stated that since she stopped working in1998, she suffered from leg cramps, fatigue, blood pressure problems, headaches, and shortness of breath with excessive exertion. R. 387. She testified that she felt better for approximately six to eight

---

[8]. The record does not contain any treatment notes or other records by Dr. Brouillete prior to April 6, 2004. Dr. Dalton, however, copied Dr. Brouillette in the April 4, 2004 Doppler Study Report and the Dual Isotope Spect Report. *See* R. 343-44.

weeks after her surgery (in April 1999), but subsequently developed pain in the legs and shortness of breath.  R. 388.  Alford also testified when she developed problems with her legs (beginning in 1998), she was able to walk about as far from the parking lot to the Wal-Mart store without difficulty. Walking to the back of the store and returning to the front cashier, however, was extremely painful. R. 389-91.  The pain in her legs stops when she stands still.  R. 391.  Alford later learned that her leg problem was claudication.  *Id.*  Alford also complained of headaches.  She stated that she suffered from headaches due to stress while she was working as a medical transcriptionist, but that her symptoms improved when she stopped working and mainly stayed at home.  *Id.*

Alford testified that she is able to stand for ten to fifteen minutes, and then would have to sit down.  R. 394-395.  Her leg and ankle swells if she sits for over a half an hour.  R. 395.  She elevates her leg during the day by putting her foot up on a chair to alleviate the swelling.  R. 396.  Alford also testified that her left hand often falls asleep.  R. 398-99.  She described her main difficulties (since she began treatment with Dr. Young in 2001) as claudication in the legs, shortness of breath, and weight gain.  R. 401.  Alford stated that she gained eighty pounds in a couple of years after her 1999 surgery. R. 394.  Alford further complained of short-term memory loss.  R. 403.

Alford also described a typical day after her 1999 surgery.  Alford testified that she spent her days doing crafts, including crocheting, painting, or cross stitching.  R. 397.  She is able to care for herself by making meals and showering.  R. 392.  She keeps the house neat, but she was unable to do any heavy cleaning or yardwork.  R. 397.  She stopped driving approximately five months before the hearing, but prior to that, she drove herself to the store.  R. 392-93, 398.

Alford's husband testified that Alford has difficulty breathing on exertion, and often complains

-36-

of being tired.  R. 413.  He also testified that Alford has leg cramps, and that as a result, he takes care of heavy activities, such as scrubbing the floor.  R. 414.  He also shops for her.  *Id.*  He also does not believe Alford can return to her past work as a transcriptionist because the job was stressful.  *Id.*  The Alford's husband further stated that he noticed Alford's short-term memory loss.  She is forgetful and repeats herself.  R. 415-16.

The ALJ also heard testimony from the VE.  R. 406-412.  The ALJ asked the VE hypothetical questions in an effort to recite work restrictions similar to Alford's.  The VE considered whether a person with Alford's work history who could perform sedentary work, but required a "sit/stand option" could perform any of Alford's past relevant work.  R. 407-08.  The ALJ described the sit/stand option as being able to periodically stand and sit, at will, while working.  R. 407.  The VE testified that the person would be able to perform the office manager position, but not the machine transcriptionist position.  The VE also testified that the office manager position would allow for occasional elevation of the leg to a ninety degree angle.  R. 407-08.  The VE further testified that the office manager position would require significant demands relative to attention, concentration, persistence, and that Alford, in her past relevant work, acquired skills transferable to other jobs (not her past relevant work) such as receptionist or a telemarketer (sedentary work).  R. 408-09.  Alford's transferable skills include the ability to speak, interact with people, pay attention to details, and clerical skills.  R. 410.  A significant amount of mental sharpness would be required to work as a receptionist or telemarketer.  R. 411.

Alford's representative next asked the VE whether Alford could perform these jobs if she could not concentrate for two thirds of the day.  The VE testified that this limitation would preclude

-37-

all work activity.  R. 411-412.

The Appeals Council considered two forms that accompanied an April 19, 2004 letter from Alford's representative.  R. 5, 6, 9.  One form listed thirteen medications current as of April 19, 2004 (and stating the date first prescribed for only one medication).  R. 375.  The other form stated that Alford had not worked within the last fifteen years.  R. 376.

### B.    THE ANALYSIS

#### 1.    Substantial Evidence Supports the ALJ's Findings on Severity

Alford claims that the Commissioner erred by failing to find that Alford's vision problems, bilateral hand weakness, and obesity were severe impairments.  Alford argues that the ALJ should have specifically discussed these impairments, and erred by failing to delineate the effects of the impairment on Alford's ability to work.  The Commissioner counters that Alford did not have significant vision problems, bilateral hand weakness, and obesity.  The Commissioner concedes that the ALJ erred by failing to specifically state whether Alford's vision problem, bilateral hand weakness, and obesity were severe, but maintains that the error is harmless.  Docket No. 17-1 at 7.  According to the Commissioner, substantial evidence in the record supports the ALJ's determination that *all* of Alford's impairments do not  significantly interfere with Alford's ability to perform her past relevant work as an office manager.

Following a detailed and thorough review of the medical and other record evidence, the ALJ found that Alford retained the residual functional capacity ["RFC"] to perform the physical exertional requirements of sedentary work, provided Alford was allowed to alternate between sitting and standing, and that she did not elevate her leg any higher than chair level (or no higher than parallel to

the floor). R. 20, Finding 6. The record simply does not support Alford's claims that her vision problems, bilateral hand weakness, and obesity impaired her ability to work prior to June 30, 2001.

First, the record contains very few diagnoses (or even complaints) of vision problems or bilateral hand weakness. Alford first reported vision problems to Dr. Souther and Dr. Joslin, the ophthalmologist in June 1999, and Dr. Souther prescribed medication to treat the vision problems on June 23, 1999. R. 243, 247. Neither Dr. Joslin nor Dr. Souther's records indicate that the vision problems were severe. *See* R. 243, 247-49. Further, Alford returned to Dr. Souther on July 9, 1999, *after* Dr. Souther prescribed medication, and the doctor's notes do not mention any vision complaints or problems. In fact, the record contains no evidence that Alford sought treatment for vision problems after June 1999.

Similarly, the record contains very few references to bilateral hand weakness. None of Alford's physicians assessed bilateral hand weakness. In September 1999, an unnamed physician referred to Alford's vision problems and bilateral hand weakness, but only in describing Alford's medical history. *See* R. 256. As late as April 23, 2002, Dr. Young observed that Alford's extremities were mainly normal. R. 322. Alford herself testified that prior to five months before the hearing, she was able to drive, and otherwise has been able to take care of herself and do light housework. R. 392-97. Alford also testified that she crochets, paints, cross stitches, and makes other crafts. R. 397.

In addition, the ALJ did not err by failing to consider Alford's obesity. Several treating physicians diagnosed obesity. None indicate that Alford's obesity impair her ability to do sedentary work. In fact, Alford's doctors encouraged her to be *more* active. In September 2001, Dr. Yarrington told Alford to walk as much as possible and exercise on a stationary bicycle in order to alleviate her

problems.  R. 291.  Dr. Young advised Alford to exercise for weight loss several times from January to April 2002.  The ALJ's determination of Alford's RFC even accounts for these possible impairments by limiting Alford to sedentary work with a sit/stand option and the opportunity to elevate her leg.  There is no evidence in the record that Alford experienced any significant functional limitations related to the three impairments beyond the limitations accurately described in Alford's RFC.  Substantial evidence supports the Commissioner's determination that Alford was not disabled prior to June 20, 2001.

2.    A Physician's Evaluation of Alford's Physical RFC Was Not Necessary

Alford also argues that the Commissioner erred by failing to obtain a physician's evaluation of Alford's physical RFC.  The Commissioner contends that a physician's evaluation of Alford's physical RFC was not necessary because the ALJ has the primary responsibility for assessing a claimant's RFC.

A non-examining physician's review of the existing medical record in order to evaluate Alford's RFC might have been helpful to the ALJ, to the Appeals Council, and to this Court. Nevertheless, it is not necessary.  It is merely the opinion of one non-examining agency physician as to how the Commissioner ought to apply the regulations.

Neither is the ALJ required to order another physician to examine Alford.  The ALJ is required to order additional medical tests and exams *only* when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  While the ALJ has a duty to fully and fairly develop the record, the ALJ is *not* required to order a consultative examination merely because the record lacks (or the claimant failed to submit) a

physician's opinion on the claimant's RFC.

Instead, the correct question is whether the evidence submitted was sufficient to allow the ALJ to render an informed decision.  In this case, the ALJ had enough evidence to conclude that Alford was not disabled.  Alford submitted hospital records, objective medical tests (EKGs, ultrasounds, etc.), and other medical evidence covering the period from 1999 to 2004 (plus two records from 1993).  She also submitted treating notes from a number of treating physicians (Dr. Blackburn, Dr. Thomas, Dr. Evans, Dr. Vines, Dr. Souther, Dr. Young, Dr. Yarrington, Dr. Brooks, and Dr. Brouillete), many of whom evaluated and treated Alford over the course of numerous visits.  The record does not support Alford's contention that she was disabled prior to June 30, 2001.  Further, the Commissioner is correct that, although the ALJ should consider opinions from medical sources on a claimant's RFC, the final responsibility for evaluating the RFC rests with the ALJ.  20 C.F.R. § 404.1527(e).[9]  Substantial evidence supports the ALJ's determination that Alford is not disabled, and remand is not necessary.

## VI.   **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk should enter a judgment for the Commissioner, and close the appeal file.

**DONE AND ORDERED** this 7th  day of August, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

---

[9]The Commissioner also contends that an RFC assessment ordered after December 26, 2002 (the date Alford filed her application for benefits) would not be helpful to establishing whether Alford became disabled prior to June 30, 2001 (the date Alford's insured status expired).  Docket No. 17-1 at 11.  This argument is without merit.  Medical opinions or tests are not useless merely because a claimant obtains them outside the relevant period.  Such an opinion or test may contain valuable information about the claimant's status during the relevant period.

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Francis H. Ayer
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817